Filed 4/16/15  P. v. Tikhomirov CA3
Opinion following transfer from Supreme Court

**<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

**----**

| | |
|---|---|
| THE PEOPLE, | C073911 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F08684) |
| v. | |
| ALEKSANDR TIKHOMIROV, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C074477 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F08684) |
| v. | OPINION ON REMAND |
| NICOLAI TCACSIN, | |
| Defendant and Appellant. | |

At a joint trial in April 2013, a jury found codefendants Aleksandr Tikhomirov and Nicolai Tcacsin guilty of grand theft and felony vandalism in Citrus Heights in

1

November 2011, and the receipt of stolen property and misdemeanor possession of drug paraphernalia in Elk Grove in December 2011. (Pen. Code, §§ 487, subd. (a), 594, subd. (a), 496, subd. (a) & Health & Saf. Code, § 11364.1, subd. (a).) The trial court suspended imposition of sentence and granted probation to both defendants, conditioned inter alia on a jail sentence.

We have consolidated defendants' separate appeals for the purpose of decision only. Defendants both argue that the trial court erred in admitting evidence of an uncharged offense; their convictions for grand theft and possessing stolen property are not supported by substantial evidence; the trial court should have instructed sua sponte on attempted theft as a lesser included offense; a probation condition regarding their possession of metals is overly broad; and a probation condition of paying booking and jail classification fees is invalid absent evidence of the actual administrative costs to the county. In individual arguments, defendant Tikhomirov maintains that his misdemeanor conviction is not supported by substantial evidence, and defendant Tcacsin identifies discrepancies between the oral pronouncement of his probation and the written order of probation.

The People concede the evidence is insufficient to support the convictions for grand theft and, upon our request for supplementary briefing, concede that the evidence is also insufficient to support a conviction for attempted *grand* theft. (These concessions moot defendants' argument regarding the absence of an instruction on attempted theft.) The People also concede the evidence is insufficient to support defendant Tikhomirov's conviction for possession of drug paraphernalia. The People further concede the need to amend the probation condition governing metal possession, and to correct the probation order to reflect the court's oral pronouncement in defendant Tcacsin's case. We will thus affirm the orders of probation as modified in these respects, and direct the trial court to issue amended probation orders. In accordance with the directions of the Supreme Court,

2

we also reiterate our order denying the petitions for rehearing:  Defendants are not entitled to the benefit of a procedure enacted while their appeals were pending in this court.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Citrus Heights Incident*

In November 2011, the owners (husband and wife) of a vacant rental home drove to the property to check on it.  It was late morning.  The property was still posted with a "for rent" sign, though a tenant was scheduled to take residence in mid-December.  The owners saw a white van partially blocking the driveway.

They had not authorized their property management company to do any work at the house.  The wife entered through the front door, while the husband went into the back yard.  He found two men in the process of disassembling the air-conditioning compressor.  The fan unit had been set to the side, its wires cut.  The coolant line had been cut without any collector being present.  The men were not wearing work gloves.

The men appeared to be startled.  They claimed to be repairing the unit pursuant to a work order.  The husband was familiar with compressor repairs, and the disassembly did not appear to be for the purposes of repair.  The men said they had the work order in their van.  They gathered up their tools and walked toward the gate, the husband following them.  As one man purported to be searching for the work order, his shorter companion got into the van and started the engine.  The first man then jumped into the passenger seat.  The husband initially jumped in after him, holding onto his shoulders; realizing this was "pretty stupid," he hopped out.  He and his wife, who had come out of the house, wrote down the van's license plate number.

The responding officer ran a check on the license plate the victims provided.  It was a white Chevy van registered to a person other than defendants.  A few weeks later, the officer prepared a photo lineup that included a picture of the registered owner and

3

five nonsuspects.  The husband identified one of the other pictures as looking somewhat like one of the people, but he was not sure.

A second officer ran a followup vehicle registration check after the first officer (because both officers testified that there was a lag time in updates).  The second officer discovered that the registration had been changed to defendant Tcacsin about a week after the first officer had checked the records.  He also learned the van had been towed after the arrest of defendants in Elk Grove in late December.  The second officer created two new separate photo lineups including each defendant.

Because he had a large caseload to which to attend, the second officer put the husband and wife in the same room at the same table, seated about a chair apart, in order to make their identifications.  (The officer had incurred a reprimand in the past for doing this.)  The couple sat in silence making their identifications before handing them to the officer.  The husband selected the pictures of the two defendants in the two lineups, and was certain of his identifications of defendant Tcacsin as the driver and defendant Tikhomirov as the passenger.  The wife also identified both defendants, with at least 90 percent certainty.  The officer then let them know that defendants were under arrest.

All told, the husband had spent at least six to eight minutes in the company of the two men.  He was certain at trial that defendants were the two men.  The wife was able to identify defendant Tcacsin at trial, but not the taller defendant Tikhomirov.  It cost them $6,000 to replace the compressor unit.

### B.  The Elk Grove Incident (Bromfield Court)

At 10:00 a.m. on December 27, 2011, a neighbor observed a white Chevy van parked in the driveway of a vacant house across the street that had a "for sale" sign in the yard.  There had not been any activity at the house, so this caught his attention.  He then saw two men wearing gloves and dark *hats* walk out of a side gate carrying parts from an air conditioner (with which he was familiar as an electrician).  He thought the men were

4

Caucasians in their early thirties; he did not get "a good look" at their faces. They got into the van, the shorter man driving. The neighbor took a picture and called 911.

An officer responded about an hour later. The neighbor told him that he would not be able to recognize the men. The air conditioner in the back yard of the vacant home was disassembled; its housing lay in pieces on the ground, while its components and the pipe connections to the home were missing. The cuts on the pipes left behind appeared fresh, and there were oily black smudge marks on the housing pieces. There were also "glove marks," which the forensic witness described as marks looking like hands or fingers but having textile patterning.

At about the same time, the police detained a white Chevy van about a half-mile away in response to a dispatch about the neighbor's observations. At the request of the police, the neighbor went to the location, and said it was the same van that he had seen across the street. Defendant Tcacsin was driving, and defendant Tikhomirov was the passenger. At the police station, the neighbor thought defendant Tikhomirov had the same stature, build, and clothing as the passenger he had seen. Similarly, he thought defendant Tcacsin had the same stature, build, and clothing as the driver. At trial, he believed defendants were the men he had seen across the street.

There was a glass pipe suitable for smoking methamphetamine in the pocket of the van's driver-side door. One officer said it was inside a glove; another officer said it was in plain view when he approached the door. The police did not find any hats in the van. There were two other pairs of gloves in the van with the initials of defendant Tikhomirov on them, and "a whole lot" of components from air conditioners (copper coiling and pipes, along with other components). The cut marks on the piping appeared to be fresh. The police did not attempt to match them to the compressor on Bromfield Court (or the compressor in the uncharged offense we next relate) because it would have been too difficult, akin to assembling a jigsaw puzzle. The coils typically do not have any

5

markings to indicate that they were the same brand as the Bromfield Court compressor, nor do most components have serial markings, so nothing connected these components specifically with the Bromfield Court compressor. There were three items with serial numbers, but the police did not check to see whether they could be matched with the Bromfield Court compressor.

Defendants did not have any oily black marks on their hands or clothing, nor were there any on the gloves in the van. Defendants also did not have any copper filings on their person.

### C. The Uncharged Incident (Allenford Place)

On the day after the Bromfield Court incident, the police were canvassing the neighborhood for additional thefts from vacant homes. About a half-mile from the Bromfield Court incident, they saw a vacant house with a "for sale" sign. When they went into the back yard, the compressor had been disassembled and its components were missing. The nature of the damage was the same as at Bromfield Court. They spoke with two neighbors about observations they had made on the day before.

One neighbor worked as an engineer for Apple; he generally came home for lunch somewhere between 11:00 a.m. and 2:00 p.m. The earliest he would be home would be 11:12 a.m. if he timed the traffic signals perfectly. (He initially testified, however, that he was on his winter break from work after Christmas when he made his observations.) He saw a white van in front of the vacant home down the block "around noon." He did not see anyone with the van, and did not see it leave. He thought a picture of defendants' van looked similar to the one he had seen.

The other neighbor had been returning from a mid-morning walk. He saw a white van turn onto the street, stop in front of the vacant home, then drive slowly away. In the van were two younger Caucasian men with short black *hair*, neither of whom was wearing a hat. He did not get a good enough look at either of them to be able to identify

6

them, and did not recognize defendants in court.  He also thought a picture of defendants' van resembled the one he had seen.

## DISCUSSION

### I.  Any Error in Admitting "Other Crimes" Evidence Was Harmless

The prosecutor initially had sought to introduce evidence of a total of four other copper-harvesting incidents in the same Elk Grove neighborhood on the issue of intent, because she anticipated that defendants would claim that they were at the Citrus Heights residence pursuant to a work order.  The Allenford Place incident was the only one of these in which witnesses had seen anything that might connect any suspects with the theft of components.  For that reason, the trial court admitted only that incident (see 1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 83, p. 468 [evidence of similar crimes not linked to anyone at all clearly inadmissible even where occurring in reasonable proximity of time and place]), not finding it particularly inflammatory, and relevant not only on the issue of intent but also as evidence of a common scheme.  The prosecutor referred only to the latter theory in closing argument.  The court's limiting instruction referred to both theories.

Relying on the general principle that evidence of other crimes *can* be highly inflammatory (citing vintage cases such as *People v. Griffin* (1967) 66 Cal.2d 459, 466, from an era more sensitive to this type of evidence), defendants argue at length that the minimal probative value of the Allenford Place incident did not warrant exposing them to this prejudice:  intent in the Citrus Heights incident was only technically at issue (and the Bromfield Court incident was *of itself* probative on that point), and the weakness of the identification of defendants as the perpetrators of the Allenford incident did not justify its introduction as a common plan in proof of the identity of the perpetrators of the Bromfield incident (see 1 Witkin, Cal. Evidence, *supra*, Circumstantial Evidence, § 94, pp. 486-487; see also 1 McCormick on Evidence (6th ed. 2006) Character and

7

Habit, § 190, pp. 752-755, 763 [common plan "seem[s] to be most often relied upon to show identity"]).[1]  They thus contend that despite the limiting instruction on use of this evidence, they are entitled to reversal given issues of identification in the Citrus Heights incident (on which we do not need to elaborate further) or the purported weakness in the evidence connecting them with the Bromfield Court incident (which we discuss in pt. III., *post*, pp. 9-10).

We agree that the connection between defendants and the uncharged incident is tenuous, but the Allenford Place incident is not *entirely* lacking in probative value.  While evidence of other crimes can *in theory* be highly inflammatory, the circumstances of the Allenford incident did not give rise to any possibility of creating an emotional bias on the part of the jury against defendants unrelated to the evidence and issues (*People v. Doolin* (2009) 45 Cal.4th 390, 439), nor did it provide such strong proof of guilt of uncharged conduct that there would be a risk the jury would convict them of the present offenses regardless of the state of the evidence (*People v. Harris* (1998) 60 Cal.App.4th 727, 738-739).  We therefore cannot find an abuse of discretion in the admission of the Allenford Place incident.

## II.  The Convictions for Grand Theft Must Be
## Reduced to Attempted Petty Theft

Defendants maintain that evidence of any asportation of the Citrus Heights air-conditioning components is lacking (*People v. Meyer* (1888) 75 Cal. 383, 384 ["it must be shown that the goods were severed from the possession or custody of the owner"]),

---

[1] Defendants also assert that a theory of common plan is not relevant to prove identity, citing the adumbrative distinction drawn in *People v. Ewoldt* (1994) 7 Cal.4th 380, 393-394 and footnote 2, between those two purposes of introducing the evidence of other crimes.  As noted in the treatises cited in the text, it is black letter law that proof of a common plan can be used to establish that a defendant committed the charged crime.  In any event, given the admissibility of the evidence on the issue of intent, common plan becomes superfluous.

8

as well as any evidence of their fair market value.[2] The People ultimately have conceded both of these points, and agree the proper remedy is to reduce both of the convictions to attempted petty theft. (Pen. Code, §§ 664, 484, subd. (a); see *People v. Navarro* (2007) 40 Cal.4th 668, 679-681 [statutory power to modify judgment to lesser offense that evidence supports (finding power limited to single lesser offense, not multiple lesser offenses)].) We accept the concession and will modify the judgments accordingly. This disposition moots the argument that the trial court erred in failing to instruct on attempt sua sponte.

### III. There Is Sufficient Evidence of Receiving Stolen Property

Defendants argue the evidence that they received stolen property in the Bromfield Court incident is insufficient because the eyewitness could say only that defendants, their van, and the components retrieved from their van (which appeared to be freshly removed from a unit) were *consistent* with the van, the men, and the components that the eyewitness had observed. Otherwise, the only connection between defendants and the observed suspects was their unexplained propinquity to the scene of the crime 20 to 50 minutes after the observations of the eyewitness. They argue the probative value of this evidence is legally insufficient because the eyewitness had told the police that the suspects were wearing dark hats (as opposed to having dark hair), which were not found in defendants' van; defendants did not have any black smudge marks or any other pipe-removal debris on their person or gloves, and no one testified that any of the components in the van had smudge marks on them; there were some components in the van with a different brand than the model of the Bromfield Court unit, and no one specifically

---

[2] Although the prosecutor apparently believed otherwise, we noted more than three-quarters of a century ago that the replacement cost of a stolen item is irrelevant to this element of Penal Code section 484. (*People v. Simpson* (1938) 26 Cal.App.2d 223, 228-229; cf. *People v. Lizarraga* (1954) 122 Cal.App.2d 436, 438 [it is fair market value and not value to any particular individual that is relevant].)

connected the others with the Bromfield unit; and there was a lack of probative value in statements of the two witnesses to the Allenford Place incident, one of whom provided a time inconsistent with defendants' being able to commit it (given the time of their arrests) and neither of whom was able to identify defendants positively as the men they had seen.

Defendants concede that the evidence of their proximity in time and space to the observations of the eyewitness rationally raises an inference of their guilt. For our part, we agree that the various discrepancies and shortcomings in the proof that they have identified are *capable* of raising an inference that they are not guilty. The exculpatory evidence, however, does not rise to the level of raising a reasonable doubt *as a matter of law* such that we can reject the jury's resolution of the issue on these contested facts as being irrational, improbable, or speculative, nor does the exculpatory evidence leave the inference of guilt resting on a " 'mere scintilla of evidence.' " (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) Defense counsel urged upon the jurors the instructed principles that they must resolve conflicting inferences, if possible, in favor of innocence and could not rest their verdicts on speculation, and then highlighted all the points defendants make here. That the jury did not find the exculpatory evidence persuasive is not something defendants or this court can gainsay.

### IV.  The Condition of Probation Must Be Modified

Defendant Tikhomirov's order of probation provides, "Defendant shall not knowingly possess (brass or copper) plates, pipes, or wiring, ferrous or non-ferrous metals, other than CRV (cans, bottles, or plastic), for the purpose of recycling or resale. Defendant shall not knowingly possess the tools used for removal of copper wiring [(specifying several examples)] without prior approval of this probation officer, or at a place of employment, for use in employment and during business hours."  In his order of probation, defendant Tcacsin's similar condition provides, "Other than for his employment, Defendant shall not possess any [of the same examples of tools used for

10

removal of copper wiring]; Defendant shall not knowingly possess brass or copper plates, pipes, wiring, [or] ferrous [or] nonferrous metals, other than cans . . . for the purposes of recycling."

In essence, defendants complain that the written order of probation is ambiguous: It is unclear whether the possession of the specified types of metals is prohibited *for any purpose*, except for cans with redemption value for purposes of recycling or resale; or whether possession of the metals *for the purposes of recycling or resale* is prohibited, except for cans with redemption value. The parties purport to find an indication that the trial court intended the first interpretation in its oral pronouncement of probation, but it should be kept in mind that the punctuation in the reporter's transcript is not that of the trial court itself.

As a matter of simple logic, the former would be the interpretation more likely to further the purpose of deterring future misconduct, because the latter would not prevent defendants, if caught red-handed with the prohibited materials, from claiming a purpose other than recycling or resale. In any event, because the orders of probation need modification in other respects, the trial court should amend the restriction on possession of metals in both cases as well to reflect its intent more clearly.

**V. The Challenges to the Booking/Jail Classification Fees Are Forfeited**

Pursuant to Government Code section *29550.1*, if the "arresting agency" is a city (here, the Elk Grove Police Department), the trial court must order reimbursement to the city (as a condition of probation) for any "criminal justice administration fee" that the county imposed for the defendant's arrest (*id*., § 29550, subd. (a)(1)). Based on the trial court's identification of a *different* provision that applies where the arresting agency is

11

*not* a city or county (*id*., § 29550.2),[3] defendants argue we must strike the condition of their probation requiring their payment of a $340.01 main jail booking fee and $62.09 main jail classification fee as administrative fees, because the record does not contain evidence of the county's actual administrative costs. The People argue only that defendants have forfeited this claim because they did not raise this objection in the first instance in the trial court. (Citing *People v. McCullough* (2013) 56 Cal.4th 589, 591, 598 (*McCullough*).) Defendants argue *McCullough* is distinguishable.

Given the focus on *McCullough*, it is surprising that the parties did not heed its explanation that there are three different statutes addressing the reimbursement of booking/classification fees, and "[w]hich section applies to a given defendant depends on which governmental entity has arrested [the] defendant before [the] transport[] . . . to a county jail." (*McCullough*, *supra*, 56 Cal.4th at p. 592.) Thus, even if defendants did not forfeit their claim—a dubious proposition in light of the focus in *McCullough* on a defendant's burden to put purported sentencing errors *at issue* in the trial court (*id*. at p. 598), and its rejection of efforts to transform forfeited factual claims into claims of the trial court's lack of legal authority to act (*id*. at p. 597)—it ultimately is inapposite because the statute that *does* apply to the payment order in this case does *not* contain any qualification that the fee must reflect actual administrative costs.[4] We thus reject

---

[3] Subdivision (a) of Government Code section 29550.2 states that it applies to "Any person booked into a county jail pursuant to any arrest by any governmental entity *not specified in* Section 29550 [(which applies to counties)] or 29550.1 [(cities and other specified local agencies)]," e.g., the California Highway Patrol (emphasis added); the statute thereafter authorizes a county to impose an administration fee not to exceed the county's actual administrative costs of receiving an arrestee into one of its detention facilities, and requires a trial court to order defendants to pay the fee as a condition of probation (or as part of the judgment of conviction if there is an ability to pay).

[4] The absence is logical, given that the factual basis of an administrative fee is not of any moment to the city or local agency that has already had to pay it to a county, whereas the

12

defendants' argument, and direct the trial court in issuing the amended probation orders to specify the correct statutory basis for payment of the booking/classification fees (i.e., Gov. Code, § 29550.1).

## VI.  There Is Insufficient Evidence of Possession of Drug Paraphernalia

As with the analogous offense of possession of controlled substances, the People must demonstrate that defendant Tikhomirov had at least joint dominion and control over the drug paraphernalia *with knowledge of its presence*; the "opportunity of access . . . without more" is insufficient.  (*People v. Redrick* (1961) 55 Cal.2d 282, 285.)

The van belonged to defendant Tcacsin, who was driving.  The drug paraphernalia was in a pocket of the van's driver-side door.  Although defendant Tikhomirov had an opportunity of access that might be sufficient to establish constructive possession, there is neither any direct evidence of his knowledge of its presence nor any circumstantial evidence of this knowledge (such as evidence of any controlled substances in or around his person or his use of controlled substances).  The People thus properly concede that the evidence is insufficient to support the conviction, and we must reverse it with directions to enter a judgment of acquittal on this count.  (*People v. Hatch* (2000) 22 Cal.4th 260, 272 [appellate ruling of insufficient evidence is functional equivalent of acquittal].)

## VII.  The Order of Probation Must Conform to the Oral Pronouncement

In defendant Tcacsin's case, the trial court orally awarded both custody and conduct credit for presentence custody, and did not order him to pay interest on victim restitution.  Yet his order of probation omits the conduct credit and directs payment of interest.  The People correctly concede that the order of probation must be modified to reflect the oral pronouncement.  (Cf. *People v. Mitchell* (2001) 26 Cal.4th 181, 185;

county that imposes the fee must demonstrate that it acted within the authority granted to it in order to recover it from a defendant.

13

*People v. Zachary* (2007) 147 Cal.App.4th 380, 387-388 [minute order and abstract of judgment must be corrected to conform to court's oral pronouncement of judgment].)

### VIII.  Proposition 47 Does Not Apply Retroactively on Appeal

In the November 2014 General Election that took place shortly after we filed the original opinion in this matter, the voters enacted Penal Code section 1170.18[5] as part of Proposition 47.  The statute allows a defendant convicted of a specified felony offense to file a recall petition (akin to the procedure in section 1170.126) to request resentencing as a misdemeanor, in accordance with provisions of the proposition that reclassify the crimes prospectively as misdemeanors.  (§ 1170.18, subds. (a), (b) [cross-referencing affected offenses].)

Defendants immediately filed petitions for rehearing, asserting we must apply the prospective reclassifications of their offenses to their pending appeals.  In written orders, we denied their petitions, stating that the provision of retroactive relief in the form of a petition to recall their sentences under section 1170.18 was evidence that the electorate did *not* intend for the retroactive application of the reclassified penalties to convictions pending on appeal.  We cited *People v. Yearwood* (2013) 213 Cal.App.4th 161, 175 (*Yearwood*), which had addressed a similar contention in the similarly structured section 1170.126.[6]  This was in accord with our subsequent decision in *People v. Noyan* (2014) 232 Cal.App.4th 657, 672 (*Noyan*) (relying on *Yearwood*, finds the defendant not entitled to reduction of sentence to misdemeanor on appeal), filed two weeks later.

---

[5]  Undesignated statutory references will be to the Penal Code.

[6]  The issue is presently pending before our Supreme Court.  (See, e.g., *People v. Conley* (2013) 215 Cal.App.4th 1482, review granted Aug. 14, 2013, S211275, case fully briefed May 7, 2014.)

Rather than simply pursue relief in the trial court, defendants petitioned for review in the Supreme Court on this basis. It granted review, transferred the matter back to this court, and directed us (notwithstanding our written orders denying the petitions for rehearing on the merits of this question) to reconsider the matter "in light of the enactment" of Proposition 47. Only defendant Tcacsin has filed a brief on remand, in which he continues to seek retroactive relief on appeal.

We had directed defendant Tcacsin to focus on distinguishing *Yearwood* from the present context. He essentially argues that *Yearwood* referenced extrinsic evidence of the electorate's concern about public safety in rejecting retroactive application absent the safeguards in the petition process, whereas the election materials in the present case do not evince any similar concern. In his view, the present initiative did not have any focus on public safety because the class of offenses were neither violent nor serious, although he acknowledges that the election materials state it was not intended to apply to people convicted of dangerous crimes like rape, murder, and child molestation. (Voter Information Guide, Gen. Elec. (Nov. 4, 2014) text of Prop. 47, §§ 2, 3, p. 70.) Tcacsin also asserts it would not further the initiative's concern with generating monetary savings if convicted felons with pending cases needed to initiate petitions to recall their sentences rather than have the reviewing court automatically reduce their punishment to misdemeanors. Finally, defendant Tcacsin invokes the much distinguished principle of the rule of lenity.

We do not find any of these purported distinctions persuasive. Moreover, we disagree with the threshold premise: We do not find the interpretive principle, contained in the common law that requires retroactive application of ameliorative criminal laws absent some form of saving clause (e.g., *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*)), is even implicated in the case at bar.

15

Addressing the latter point first, the Penal Code presumes prospective operation of any enactment unless a *manifest* intent to the contrary appears in extrinsic indicia. (*People v. Brown* (2012) 54 Cal.4th 314, 319 (*Brown*).) *Estrada* established a rule of interpretation under which a reduction in criminal punishment is treated as "inevitable" intrinsic indicia of intent of retroactive application absent *some* form of saving clause from which a court can infer the contrary. (*Estrada*, *supra*, 63 Cal.2d at pp. 744-745, 747-748.) As restated in *Brown*, however, this principle applies *only* where a statute involves the reduction of a *particular* punishment for a *particular* crime. (*Brown*, at pp. 324-325.) Therefore, the increase in accrual of conduct credits at issue in *Brown*, being a reduction in punishment generally applicable to *all* presentence custody, did not satisfy these restated criteria for application of the *Estrada* principle. (*Brown*, at pp. 317-318, 325.) By a parity of reasoning, the reduction in punishment for a *broad* number of crimes (see § 1170.18, subds. (a) & (b)) in Proposition 47 has collective application to a class of different crimes and defendants, and accordingly does not satisfy the restated *Estrada-Brown* criteria for applying an inevitable intrinsic inference of an intent for retroactive application to defendants with cases not yet final on appeal. (Cf. *People v. Crockett* (2015) 234 Cal.App.4th 642, 660-661, petn. for review filed Mar. 24, 2015, S225198 [§ 1170.18, subd. (c) does not apply retroactively to cases not final on appeal].)

Even under *Estrada*, defendant Tcacsin does not prevail. First, *Yearwood* was not *premised* on the legislative history of the proposition; it merely stated the evidence of voter intent was "consistent with" its conclusion that providing a postconviction remedy was the "functional equivalent" of an express saving clause. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 175.) The same is true here. While the ballot materials were perhaps more focused on cost savings than public safety, the latter was nonetheless *a* concern (there being express assurances that the proposition would not apply to dangerous felons). Automatic application of a misdemeanor sentence to all defendants

with cases pending on appeal would eliminate the screening device designed to identify those who pose a risk of committing certain violent felonies. (§ 1170.18, subds. (b), (c) & (i) [cross-referencing list of violent felonies in § 667, subd. (e)(2)(C)(iv)].) This would be at odds with the ballot materials. Finally, the "rule of lenity" applies only where intrinsic or extrinsic evidence of the intent behind legislation stands in equipoise, and we do not have any such evidence pointing in both directions in the present case. (*People v. Elder* (2014) 227 Cal.App.4th 1308, 1315.) Thus, as we stated in denying rehearing, and in *Noyan*, *supra*, 232 Cal.App.4th 657, the provision of the postconviction remedy of a recall petition in section 1170.18, like the analogous remedy in section 1170.126, rebuts the *Estrada* presumption of retroactive application to cases pending on appeal.

## DISPOSITION

The convictions for grand theft are modified to attempted petty theft; defendant Tikhomirov's conviction for possession of drug paraphernalia is reversed with directions to enter a judgment of acquittal. The trial court is directed to issue amended probation orders, which should reflect these modifications to the convictions, a modification to the probation condition regarding possession of metals to reflect its intent more clearly, the proper statutory basis for ordered reimbursement of administrative fees (Gov. Code, § 29550.1), and (in defendant Tcacsin's case) the award of 70 days of conduct credits and the absence of any obligation to pay interest on the order for victim restitution.

                                              BUTZ , J.

We concur:

RAYE , P. J.

DUARTE , J.

17